IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

VICKIE L. RAY                    )
                                 )
v.                               )    No. 2:05-0033
                                 )    Judge Nixon/Brown
JO ANNE B. BARNHART, Commissioner )
of Social Security               )


To:  The Honorable John T. Nixon, Senior Judge


**REPORT AND RECOMMENDATION**

           This is a civil action filed pursuant to 42 U.S.C.

§405(g), to obtain judicial review of the final decision of the

Commissioner of Social Security denying plaintiff disability

insurance benefits ("DIB"), as provided under Title II of the

Social Security Act ("the Act"), as amended.  The case is

currently pending on plaintiff's motion for judgment on the

administrative record (Docket Entry No. 7), to which defendant

has responded (Docket Entry No. 12).  For the reasons stated

below, the Magistrate Judge recommends that plaintiff's motion be

**DENIED**, and that the decision of the Commissioner be **AFFIRMED**.


## I.  INTRODUCTION

           Plaintiff filed her DIB application on April 27, 2001,

alleging an onset of disability as of November 11, 2000, due to

carpal tunnel problems in both hands and bad dizzy spells (Tr.

55).  Plaintiff's application was denied initially and upon

1

reconsideration (Tr. 30-40). She thereafter requested and received a hearing before an Administrative Law Judge ("ALJ"), at which hearing plaintiff was represented by counsel and gave testimony, as did an impartial vocational expert ("VE"). The hearing was held on December 18, 2003 (Tr. 344-374). The ALJ took the case under advisement, and on August 9, 2004, rendered a written decision denying plaintiff's disability claim (Tr. 23-28). The ALJ made the following findings:

1.  The claimant met the disability insured status requirements of the Act on November 11, 2000, her alleged disability onset date, and continues to meet them through at least the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since November 11, 2000, her alleged disability onset date.

3.  The claimant's "severe" impairments are an anxiety disorder, obesity, and the residuals of bilateral carpal tunnel releases with residual pain. 20 CFR § 404.1520(b).

4.  The claimant's impairments do not meet or medically equal the criteria of any listed impairments in Appendix 1 to Subpart P of Regulations No. 4.

5.  As discussed above, the claimant's creditability was only fair, if not poor.

6.  The claimant can perform the residual functional capacity described above.

7.  The claimant cannot perform her past relevant work [as a] fast food worker, a waitress, an inspector/grader, and a small product assembler. 20 CFR § 404.1565.

8.  With a high school education but without transferable skills, the claimant is a younger individual. 20 CFR §§ 404.1563, 404.1564, and 404.1568.

9.  Considering her residual functional capacity and
    vocational factors and using Rule 202.20 as a framework
    for decisionmaking, a significant number of jobs which
    the claimant can perform exist in the regional and
    national economies.  Examples and numbers of such jobs
    are given above.  Table 2 of Appendix 2 to Subpart P of
    Regulations No. 4; 20 CFR § 404.1569.

10. The claimant has not been under a "disability," as
    defined in the Social Security Act, at any time through
    the date of this decision.  20 CFR § 404.1520(f).

(Tr. 28).

On March 4, 2005, the Appeals Council denied

plaintiff's request for review of the decision of the ALJ (Tr. 6-

8), thereby rendering that decision the final decision of the

Commissioner.  This civil action was thereafter timely filed, and

the Court has jurisdiction.  42 U.S.C. § 405(g).  If the

Commissioner's findings are supported by substantial evidence,

based on the record as a whole, then these findings are

conclusive.  Id.

## II.  REVIEW OF THE RECORD[1]

### A.  Medical Evidence

### 1.  Carpal Tunnel Syndrome

On November 5, 1999, plaintiff was seen by J. Sherrill,

M.D., for pain and tingling in both hands and wrists (Tr. 309-

310).  Dr. Sherrill diagnosed bilateral carpal tunnel syndrome,

---

[1]This review is taken from defendant's response to plaintiff's motion
for judgment (Docket Entry No. 12, pp. 3-12).

3

returned her to work the same day with restrictions, and referred her to an orthopedic surgeon. Id. Plaintiff was seen by Clifford L. Posman, M.D., an orthopedic surgeon, on December 15, 1999, for complaints of bilateral hand pain, numbness, and tingling (Tr. 155-156). Dr. Posman prescribed Naprosyn and bilateral wrist splits and recommended that plaintiff undergo a nerve conduction study. Id. The nerve study, which took place on December 23, 1999, revealed bilateral carpal tunnel syndrome with Martin-Gruber anastomosis[2] on the left but was otherwise normal (Tr. 154, 157-159).

On December 29, 1999, Dr. Posman diagnosed recurrent tenosynovitis in both hands, and he prescribed Celebrex[3] and instructed plaintiff to rest her hands for fifteen minutes every two hours (Tr. 145). He noted complaints of persistent pain but no tingling or numbness, and he assessed her grip strength at sixty-five pounds on the right and fifty pounds on the left. Id. He also noted that she had excellent sensation, and tests for Finkelstein's sign, Phalen's sign, and Tinel's sign were all negative. Id.

Plaintiff underwent carpal tunnel release surgery on

_____

[2]Martin-Gruber anastomosis is a nerve anomaly in the forearm consisting of a median to ulnar nerve communication. Stedman's Medical Dictionary, CD-ROM, Stat!Ref Library Third Qtr. '05.

[3]Celebrex is prescribed for, among other things, arthritis, acute pain, and menstrual pain. The Pill Book ("Pill Book") 194 (CMD Publishing, 10th ed. 2002).

4

the right hand on January 25, 2000, and had a good recovery (Tr. 137-140, 152).[4] On February 3, 2000, Dr. Posman found that the tingling was much better with the right hand, but continuing problems with the left hand necessitated release surgery on that hand (Tr. 153). That surgery took place on February 25, 2000 (Tr. 133-136). On March 6, 2000, Dr. Posman stated that the left hand was doing well and had "excellent sensation throughout all ten digits" (Tr. 151).

On April 3, 2000, plaintiff continued to complain of problems with her hands, but Dr. Posman stated that she "feels that she can return to work next Monday if they have light duty restrictions" (Tr. 150). He found a grip strength of forty pounds in the right hand and thirty-five pounds in the left, with well healed incisions. He found her able to return to work on May 11, 2000, without restrictions, and he had her continue with occupational therapy. Id.

On June 5, 2000, three months after the right hand surgery and fourteen weeks after the left hand surgery, plaintiff was back at work at a light duty job (Tr. 148). She had mildly increased pain in the right hand; decreased sensation in the right index finger, left index finger, and left thumb; mild tenderness over the incision; and a grip strength of fifty-five

---

[4]Surgery was originally scheduled for January 13, 2000 (Tr. 139), but plaintiff was diagnosed with an acute upper respiratory infection on that date and it appears the surgery was postponed (Tr. 308).

5

pounds in the right hand and forty-five pounds in the left hand. Id. Plaintiff was seen by Dr. Posman on July 17, 2000, for complaints of pain and a "falling asleep" sensation in both hands (Tr. 147). He found a positive Phalen's sign and possible Tinel's sign in the right hand but negative findings in the left hand. Id. He diagnosed tenosynovitis with mild recurrent right carpal tunnel syndrome. Id. Plaintiff received a steroid injection in the right hand on August 14, 2000, for what Dr. Posman identified as "resolving tenosynovitis." Id.

On September 11, 2000, plaintiff had an on-the-job injury resulting in elbow and shoulder pain in both arms that increased with use (Tr. 306-307). She was diagnosed with musculoskeletal strain and found unable to do overhead work and no more than an eight-hour shift. Id. On November 6, 2000, Dr. Posman noted that a prescription for Celebrex had helped with the shoulder pain but not the hand pain (Tr. 144). He wrote that she had "good sensation throughout all ten digits," with full hand and wrist motion and negative Phalen's and Tinel's signs at the carpal tunnel points. Id. He also found a negative Finkelstein's sign at the wrist. Id. He again diagnosed tenosynovitis of both hands from repetitive overuse, and he recommended that she avoid highly repetitive activities and continue the Celebrex medication. Id.

Plaintiff returned to Dr. Posman on December 18, 2000,

6

for reevaluation of both her hands (Tr. 143). She told him that she had not worked for the past six weeks, ever since she had turned in her resignation at her workplace. Id. Dr. Posman noted persistent tenosynovitis with a three percent permanent physical impairment to each upper extremity. He wrote: "She may return to work but cannot do repetitive motion activities for more than 4 hours in an 8 hour day." Id. He prescribed Naprosyn. Id. This was the last medical record entry with evidence of carpal tunnel syndrome.

2. <u>Gynecological Issues and Dizziness</u>

On February 22, 2001, plaintiff went to the hospital for dizziness, nausea, and chest pain (Tr. 254, 271). She underwent an EKG, which was normal, and a chest x-ray, also normal (Tr. 267-272). She was seen by Douglas R. Carpenter, M.D., on March 2, 2001, to follow up on her "multiple episodes of near syncope" and blurred vision, with "no answer" and normal laboratory test results (Tr. 302-303, 311-314). Dr. Carpenter diagnosed her with syncope and collapse, and decided to try to rule out a central nervous system problem, physiological problems, and premenstrual syndrome. Id. On March 7, 2001, plaintiff underwent an MRI of the head, which was found to be normal (Tr. 160, 162). Plaintiff was seen at the hospital on March 11, 2001, for an unspecified reason, during which time blood tests were done (Tr. 253, 264-266).

7

On March 16, 2001, plaintiff returned to Dr. Carpenter for follow-up of her episodes of near syncope (Tr. 300-301). He noted that her episodes were "worse" during times of her menstrual period and when she experienced anxiety, but he noted that the MRI and laboratory tests were negative and she had had no further episodes. Id. He noted a mild headache with the medications. Id. On April 23, 2001, Dr. Carpenter found plaintiff feeling better, although with "some sweats," and not pregnant (Tr. 298-299).

On July 29, 2001, plaintiff was seen at the emergency room for menorrhagia and pelvic pain and was admitted to the hospital for one night (Tr. 168-181). A July 30, 2001, pelvic ultrasound was normal (Tr. 173, 255). Plaintiff was discharged to her home with a prescription for birth control pills (Tr. 171). On August 24, 2001, Kimberly Claypool, M.D., F.A.C.O.G., examined plaintiff because of a heavy period and complaints of pain, and she prescribed Darvocet[5] (Tr. 191).

On September 10, 2001, plaintiff was seen at the emergency room for complaints of lower abdominal pain (Tr. 226-228, 256-260). She was taking the contraceptive medication

---

[5]Darvocet is an analgesic and chemical derivative of methadone prescribed for mild to moderate pain. Pill Book at 880-881.

8

Ovral,[6] as well as Naproxen, Paxil,[7] and Darvocet. Id. The
attending doctor noted that plaintiff was screaming and crying,
but an abdominal x-ray showed only a nonspecific gas pattern. Id.
A pregnancy test was negative. Plaintiff was diagnosed with
acute lower abdominal pain and anxiety and hysteria secondary to
the pain. Id. Plaintiff did not allow the doctor to finish the
examination and she was discharged against medical advice. Id.

On March 7, 2002, Dr. Claypool prescribed Lo/Ovral[8] and
planned a follow-up appointment for four months later (Tr. 331).
On April 5, 2002, Dr. Claypool noted that plaintiff had asked for
sample packs of Lo/Ovral or Alesse (Tr. 331). On April 25, 2002,
a blood test was positive for Hepatitis B (Tr. 319, 322-323). On
January 13, 2003, Dr. Claypool provided plaintiff with a two-
month prescription for Lo/Ovral (Tr. 330).

### 3. Fertility Issues

On June 12, 2000, plaintiff was seen by her
obstetrician, Dr. Claypool (Tr. 194).[9] Dr. Claypool's assistant

---

[6]Ovral, like Alesse, is another brand name for the oral contraceptive.
Pill Book at 278-280.

[7]Paxil is a selective serotonin reuptake inhibitor ("SSRI") prescribed
for, among other things, depression and generalized anxiety disorder. Pill
Book at 953.

[8]Lo/Ovral is another brand name for the oral contraceptive. Pill Book
at 278-280.

[9]Plaintiff had seen Dr. Claypool on February 19, 1997, for help with
becoming pregnant (Tr. 205). On September 29, 1997, plaintiff began taking
Serephone, a fertility drug (Tr. 204-205), and she became pregnant (Tr. 110).
She delivered her child on July 29, 1998 (Tr. 126-132).

9

noted that plaintiff had not taken birth control pills for one month and had not gotten pregnant, and that Dr. Claypool had told her to call if she could not get pregnant. <u>Id.</u> On July 10, 2000, plaintiff underwent a venous ultrasound examination of the lower extremities (Tr. 161, 163). The exam was normal. <u>Id.</u>

On August 6, 2001, plaintiff met with Dr. Claypool to discuss her infertility (Tr. 192). Dr. Claypool "strongly encouraged" plaintiff to lose weight, started her on a prescription of Premarin,[10] and wrote that she planned to use Clomid[11] to help her become pregnant. <u>Id.</u>

On March 28, 2003, Dr. Claypool prescribed Femara[12] and instructed plaintiff to use an ovulation predictor kit "and see if she won't become pregnant....Today, her pregnancy test is negative." <u>Id.</u> On April 29, 2003, Dr. Claypool wrote: "She took her Femara. It was noted that she ovulated on day 10. She is one day late....Pregnancy test today is negative." (Tr. 330).

On July 21, 2003, Dr. Claypool had plaintiff discontinue the Femara (Tr. 329). On October 27, 2003, Dr. Claypool wrote that plaintiff had taken Femara for six months

---

[10]Premarin is an estrogen prescribed for, among other things, ovarian failure and abnormal bleeding of the uterus. <u>Pill Book</u> at 427-428.

[11]Clomid is the brand name for a drug used to induce ovulation and often resulting in multiple births. <u>Stedman's Medical Dictionary</u>, CD-ROM, Stat!Ref 3rd Qtr. '05.

[12]Femara is the brand name for letrozole, a medication used to treat infertile women who have an ovulation problem. <u>http://www.ivf.com/clom.html</u>

without results and wondered why she did not try Clomid.  Id.  On
November 3, 2003, Dr. Claypool noted that plaintiff wanted to try
Clomid for a couple of months and would not be able to see a
fertility doctor in Nashville until February 2004 (Tr. 328).  Dr.
Claypool called in the Clomid prescription.  Id.

### 4.  Anxiety

Plaintiff was taking Paxil, a medication that is often
prescribed for anxiety, on March 2, 2001, when she was seen by
Dr. Carpenter (Tr. 302-303).  At a follow-up appointment on March
16, 2001, Dr. Carpenter noted that plaintiff's episodes of "near
syncope" (dizziness) were worse around the time of her period and
"with anxiety," but that her emotional stability was normal (Tr.
300).  On April 23, 2001, plaintiff was taking Paxil; her
emotional stability was normal on this date (Tr. 298).  On
September 10, 2001, however, when plaintiff was seen at the
emergency room for complaints of lower abdominal pain, she was
diagnosed with anxiety and hysteria, but these diagnoses were
found to be secondary to the pain she was alleging (Tr. 226-228,
256-260).  On October 15, 2001, Dr. Carpenter found that
plaintiff's anxiety attacks were "breaking through" on her
current medications because of increased stressors, so he
prescribed Xanax[13] (Tr. 297).

On October 22, 2001, consultative examiner Mark A.

_____

[13]Xanax is a tranquilizer.  Pill Book at 48-51.

11

Loftis, M.A., L.P.E., evaluated plaintiff (Tr. 273-276).[14] Mr. Loftis noted that plaintiff reported that she had resigned from her employment at Delbar due to medical problems, and he diagnosed her with anxiety disorder not otherwise specified. Id. He noted the history of carpal tunnel syndrome, and he assessed her with a current global assessment of functioning ("GAF") of 60.[15] Id. Mr. Loftis wrote: "Emotionally, her anxiety attacks do appear that they could be problematic in the work setting. Appropriate treatment should be able to alleviate the recurrence of anxiety attacks, or at the very least, allow them to be more manageable." Id.

On October 31, 2001, State agency physician R. Kourany, M.D., completed a psychiatric review technique form in which he assessed plaintiff's complaints of anxiety under listing 12.06, anxiety-related disorders (Tr. 277-290). Dr. Kourany found that Anxiety Disorder NOS [not otherwise specified] was present and that plaintiff was being treated with Xanax and Wellbutrin.[16] Id.

On November 5, 2001, Dr. Carpenter noted that

---

[14]Mr. Loftis's report was cosigned by William R. Sewell, Ph.D. (Tr. 276).

[15]The GAF scale runs from 0 to 100, with the highest level of function being 100. A GAF of 60 indicates moderate symptoms (51 to 60), one point below mild symptoms (61 to 70). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (American Psychiatric Association, 4th ed. 1994).

[16]Wellbutrin is an antidepressant. Pill Book at 159.

12

plaintiff's anxiety attacks were under better control but still
present, and he increased her dosage of Wellbutrin (Tr. 295-296).

### 5. Gallstones

On November 4, 2003, plaintiff was diagnosed with
multiple gallstones and fatty liver (Tr. 325-326). She was seen
on November 11, 2003, by Mark A. Fox, M.D., F.A.C.S., for
gallbladder problems and was diagnosed with cholelithiasis
without obstruction (Tr. 341). She underwent a cholesystectomy[17]
by laparoscopy and was seen by Dr. Fox on December 4, 2003, at
which time Dr. Fox noted that plaintiff had no complaints and was
"doing well" (Tr. 343).

### B. Vocational and Other Evidence

Plaintiff was born on September 8, 1969 (Tr. 55),
making her thirty-four years old at the time of the hearing (Tr.
347). She left school at the end of the tenth grade and then
obtained a General Equivalency Diploma (Tr. 348). She was
married with two children (Tr. 352, 358). Plaintiff testified
that pain in her hands had caused her to modify her activities of
daily living by limiting the extent of them, to include personal
grooming habits, care devoted to her daughters, housecleaning,
automobile driving ability, and sleeping habits (Tr. 351-360).
For example, she stated that she had to cut short her hair and

---

[17]A cholesystectomy is the surgical removal of the gallbladder.
http://www.gicare.com/pated/epdlv01.htm

that of her daughters to minimize problems with brushing, could no longer wrestle with her daughters, go bowling, play baseball, or drive out of town; was unable to hang up the family's clothing, mop the kitchen floor every day, shampoo the carpets, wash the dishes or neatly fold the laundry; and required a nap in her recliner, lasting twenty to thirty minutes, every hour of the day. Id.

Plaintiff's previous work included a factory job in which she worked with vehicle mirrors, a fast food job in which she oversaw a food buffet and cooked, a fast food cashier job, and a job in a food plant removing inferior quality beans from a conveyor belt (Tr. 348-350).

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Secretary, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Secretary, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as

14

a reasonable mind would accept as adequate to support the conclusion." Her v. Commissioner, 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Commissioner, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Secretary, 753 F.2d 517, 519 (6th Cir. 1985).

B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2) If the claimant is not found to have an impairment which

15

significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[18] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima</u> <u>facie</u> case of disability.

(5) Once the claimant establishes a <u>prima</u> <u>facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the

---

[18] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

16

claimant's _prima_ _facie_ case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Secretary, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement of Errors

Plaintiff alleges that the ALJ's adverse credibility finding and rejection of her subjective complaints of disabling pain and anxiety are erroneous, in that the ALJ's analysis failed to comport with the standards prescribed in the regulations, at 20 C.F.R. § 404.1529(c). Plaintiff's pain is in her wrists and hands, and the record reveals diagnoses of carpal tunnel syndrome in both wrists, release surgeries on both wrists, and subsequent continued complaints of pain and limited use of both hands. Plaintiff contends that the record substantiates her subjective complaints, pointing to the limitations prescribed by treating and examining physicians and to the consistency of her complaints of constant pain exacerbated by repetitive motion with her hands

17

and arms.

In the Sixth Circuit, subjective complaints of disabling symptoms are evaluated under the following standard, enunciated in <u>Duncan v. Sec'y of Health & Human Servs.</u>, 801 F.2d 847, 853 (6th Cir. 1986): "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."

Plaintiff clearly suffers from an underlying medical condition which has been objectively verified on this record. Where, as here, the medical evidence alone does not confirm the existence of pain at a disabling level of severity, or the existence of a condition so severe as to be reasonably expected to produce *disabling* pain, but does confirm the existence of a condition which could be reasonably expected to produce some pain in the area complained of, the credibility of the claimant's pain complaints is to be determined by reference to other factors in addition to the medical evidence, including plaintiff's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment

18

or measures, other than medication, taken to relieve the pain;
and any other factors concerning functional limitations and
restrictions due to pain or other symptoms.  E.g., Luna v. Bowen,
834 F.2d 161, 164 (10th Cir. 1987)("[I]f an impairment is
reasonably expected to produce *some* pain, allegations of
*disabling* pain emanating from that impairment are sufficiently
consistent to require consideration of all relevant evidence."
(emphasis in original)); 20 C.F.R. § 404.1529(b), (c); Social
Security Ruling 96-7p, 61 Fed. Reg. 34483, at *34484-34485.  See
also Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.
1997)(finding that medical evidence did not establish a condition
which could reasonably be expected to produce the alleged
disabling pain, but nonetheless recognizing that § 404.1529
required the ALJ to consider other factors before dismissing the
claimant's subjective complaints); Felisky v. Bowen, 35 F.3d
1027, 1037-41 (6th Cir. 1994).[19]

Plaintiff in her brief argues persuasively that the
factors enumerated in § 404.1529(c)(3) are supportive of her
claim for disability.  Indeed, had the ALJ assessed the severity
of plaintiff's condition solely by reference to the medical
evidence of her lifting restriction and other such objective

---

[19]The court in Felisky found that the Duncan standard for analysis of
pain complaints is simply "a more succinct form" of the standard established
in 20 C.F.R. § 404.1529, entitled "How we evaluate symptoms, including pain."
35 F.3d at 1038-39.

19

indicia, his decision may well have been reversed in view of § 404.1529(c) and its application to the facts of this case, despite the ALJ's cursory reference to his consideration of those factors on page four of his decision (Tr. 26). However, this case was not decided without reference to other, non-medical evidence of plaintiff's functional limitations.

In assessing the credibility of plaintiff's subjective complaints, the ALJ focused on her desire and repeated attempts to conceive another child through fertility treatments, reasoning that this desire was inconsistent with plaintiff's allegations of disabling pain in her hands and the professed difficulty in general of her life with two young daughters and an anxiety disorder (Tr. 26). Despite plaintiff's argument that she canceled her 2004 appointment with a fertility specialist based on her and her husband's decision that "she could not handle the stress of another child" (Docket Entry No. 8, p. 9), the record contains numerous references to treatment by her obstetrician with fertility drugs, during the years following her alleged onset date of November 11, 2000 and continuing as late as November 2003 (one month prior to the ALJ hearing) (Tr. 328). The ALJ also noted that plaintiff was able to drive short distances despite her allegation of sudden-onset dizziness, and that despite her testimony that she could not afford her anxiety medications even with her husband's insurance (Tr. 365), she was

20

apparently able to afford fertility treatments which were not covered by insurance. The ALJ concluded that, "[g]iven such inconsistencies, contradictions, and other circumstances, the claimant's creditability could only be considered fair, if not poor." (Tr. 26).

The ALJ's credibility finding is entitled to deference because of his opportunity to observe plaintiff at the administrative hearing. Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so." Wines v. Comm'r of Soc. Sec., 268 F.Supp.2d 954, 958 (N.D. Ohio 2003)(citing Felisky, 35 F.3d at 1036). Here, the ALJ has clearly stated his reasons for discrediting plaintiff's subjective allegations and complaints, and the undersigned cannot conclude that his reasoning is legally flawed or otherwise unentitled to the deference the law prescribes. Indeed, as a practical matter the undersigned must agree that "[plaintiff's] attempts to have another child strongly suggest that she is much more capable than she claims" (Tr. 26), to say nothing of the conflict an infant would present for the ten-pound lifting/carrying restriction credited by the ALJ. More importantly, the ALJ cited (albeit cursorily) his observance of the regulatory requirements for considering subjective complaints, and the factors he found compelling are clearly

21

encompassed by the regulatory direction to consider "other factors" relating to functional ability. 20 C.F.R. § 404.1539(c)(3)(vii). Accordingly, the undersigned finds no error in the ALJ's consideration of plaintiff's subjective complaints of disabling symptoms.

The ALJ's recognition of largely moderate functional limitations, associated with plaintiff's hand and arm problems and her anxiety, appears to be supported by substantial evidence including the assessment of her treating physician Dr. Posman and the psychological evidence of record. In response to a hypothetical question including those limitations and the aforementioned ten-pound lifting restriction, the VE was able to identify a substantial number of light and sedentary jobs which plaintiff could perform (Tr. 371-72). Accordingly, the finding of no disability appears to be well supported and should be affirmed.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it

Case 2:05-cv-00033   Document 14   Filed 11/17/05   Page 22 of 23 PageID #: 62

with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

        **ENTERED** this 16th day of November, 2005.


              /s/ Joe B. Brown           
             JOE B. BROWN
             United States Magistrate Judge

Case 2:05-cv-00033   Document 14   Filed 11/17/05   Page 23 of 23 PageID #: 63